# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS

```
* * * * * * * * * * * * * * * * * * * *
ALAN PETERSON,                        *
                                      *
              Petitioner,             *    No. 17-732V
                                      *    Special Master Christian J. Moran
v.                                    *
                                      *
SECRETARY OF HEALTH                   *    Filed: October 23, 2019
AND HUMAN SERVICES,                   *
                                      *    Onset of shoulder pain, fact ruling
              Respondent.             *
* * * * * * * * * * * * * * * * * * * *
```

Shealene P. Mancuso, Muller Brazil, LLP, Dresher, PA, for petitioner;
Debra A. Filteau Bagley, United States Dep't of Justice, Washington, DC, for
respondent.

## UNPUBLISHED RULING FINDING FACTS[*]

On June 2, 2017, Alan Peterson filed a petition for compensation under the
National Childhood Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-
10—34 (2012), alleging that he suffers from right shoulder injuries as a result of
the influenza vaccine he received on October 27, 2015.  Pet. at 1-2.  The parties
dispute when Mr. Peterson started to experience pain in his right shoulder for
purposes of determining the existence of a SIRVA table injury.  For the reasons
explained below, the undersigned finds that a preponderance of the evidence
supports an onset date of approximately July 14, 2014, for Mr. Peterson's
symptoms.

---

[*] The E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (Dec. 17,
2002), requires that the Court post this ruling on its website.  Anyone will be able to access this
ruling via the internet (https://www.uscfc.uscourts.gov/aggregator/sources/7).  Pursuant to
Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical
information or other information described in 42 U.S.C. § 300aa-12(d)(4).  Any redactions
ordered by the special master will appear in the document posted on the website.

## Procedural History

As support for his claim and the onset of his injury, Mr. Peterson filed affidavits and medical records.  The Secretary filed a Rule 4(c) report that disputed Mr. Peterson's claim and the onset of his injury.  The Secretary took issue particularly with Mr. Peterson's satisfaction of the first two requirements for establishing a SIRVA table injury, namely that (1) there was no history of pain in the affected shoulder that would account for the claimed injury, and (2) the pain occurred within 48 hours after the flu vaccine was administered.  See 42 C.F.R. § 100.3(c)(10).

In lieu of a hearing, the parties agreed to proceed with videotaped depositions of witnesses.  The undersigned appreciates and thanks the attorneys for their professionalism in conducting these alternative procedures.  Videotaped depositions of Alan Peterson, Susan Peterson, and Daryl Steinke were taken on August 22, 2018.  A telephonic deposition of Javier Alvarez was taken on December 13, 2018.  After the submission of the deposition transcripts and video, Mr. Peterson moved for a ruling on the record, and the Secretary filed a response. With these submissions, this matter is ripe for adjudication.

## Standard for Finding Facts

Petitioners are required to establish their cases by a preponderance of the evidence.  42 U.S.C. § 300aa–13(1)(a).  The preponderance of the evidence standard requires a "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." Moberly v. Sec'y of Health & Human Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

The process for finding facts in the Vaccine Program begins with analyzing the medical records, which are required to be filed with the petition.  42 U.S.C. § 300aa–11(c)(2).  Medical records that are created contemporaneously with the events they describe are presumed to be accurate.  Cucuras v. Sec'y of Health & Human Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Not only are medical records presumed to be accurate, they are also presumed to be complete, in the sense that the medical records present all the patient's medical issues.  Completeness is presumed due to a series of propositions. First, when people are ill, they see a medical professional.  Second, when ill people

2

see a doctor, they report all of their problems to the doctor.  Third, having heard about the symptoms, the doctor records what he or she was told.

Appellate authorities have accepted the reasoning supporting a presumption that medical records created contemporaneously with the events being described are accurate and complete.  A notable example is <u>Cucuras</u> in which petitioners asserted that their daughter, Nicole, began having seizures within one day of receiving a vaccination, although medical records created around that time suggested that the seizures began at least one week after the vaccination.  <u>Cucuras</u>, 993 F.3d at 1527.  A judge reviewing the special master's decision stated that "[i]n light of [the parents'] concern for Nicole's treatment . . . it strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms.  It is equally unlikely that pediatric neurologists, who are trained in taking medical histories concerning the onset of neurologically significant symptoms, would consistently but erroneously report the onset of seizures a week after they in fact occurred."  <u>Cucuras v. Sec'y of Health & Human Servs.</u>, 26 Cl. Ct. 537, 543 (1992), <u>aff'd</u>, 993 F.2d 1525 (Fed. Cir. 1993).

Judges of the Court of Federal Claims have followed <u>Cucuras</u> in affirming findings by special masters that the lack of contemporaneously created medical records can contradict a testimonial assertion that symptoms appeared on a certain date.  <u>See, e.g.</u>, <u>Doe/70 v. Sec'y of Health & Human Servs.</u>, 95 Fed. Cl. 598, 608 (Fed. Cl. 2010) (stating "[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), <u>aff'd sub nom.</u> <u>Rickett v. Sec'y of Health & Human Servs.</u>, 468 Fed. Appx. 952 (Fed. Cir. 2011) (non-precedential opinion); <u>Doe/17 v. Sec'y of Health & Human Servs.</u>, 84 Fed. Cl. 691, 711 (2008); <u>Ryman v. Sec'y of Health & Human Servs.</u>, 65 Fed. Cl. 35, 41-42 (2005); <u>Snyder v. Sec'y of Health & Human Servs.</u>, 36 Fed. Cl. 461, 465 (1996) (stating "The special master apparently reasoned that, if Frank suffered such [developmental] losses immediately following the vaccination, it was more likely than not that this traumatic event, or his parents' mention of it, would have been noted by at least one of the medical record professionals who evaluated Frank during his life to date.  Finding Frank's medical history silent on his loss of developmental milestones, the special master questioned petitioner's memory of the events, not her sincerity."), <u>aff'd</u>, 117 F.3d 545, 547-48 (Fed. Cir. 1997).

The presumption that contemporaneously created medical records are accurate and complete is rebuttable, however.  For cases alleging a condition found in the Vaccine Injury Table, special masters may find when a first symptom

appeared, despite the lack of a notation in a contemporaneous medical record.  42 U.S.C. § 300aa-13(b)(2).  By extension, special masters may engage in similar fact-finding for cases alleging an off-Table injury.  In such cases, special masters are expected to consider whether medical records are accurate and complete.  To overcome the presumption that written records are accurate, testimony is required to be "consistent, clear, cogent, and compelling."  Blutstein v. Sec'y of Health & Human Servs., No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998).

In determining the accuracy and completeness of medical records, special masters will consider various explanations for inconsistencies between contemporaneously created medical records and later given testimony.  The Court of Federal Claims has identified four such explanations for explaining inconsistencies: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist.  La Londe v. Sec'y Health & Human Servs., 110 Fed. Cl. 184, 203 (2013), aff'd, 746 F.3d 1334 (Fed. Cir. 2014).

When weighing divergent pieces of evidence, special masters usually find contemporaneously written medical records to be more significant than oral testimony.  Cucuras, 993 F.2d at 1528.  Testimony offered after the events in question is less reliable than contemporaneous reports when the motivation for accurate explication of symptoms is more immediate.  Reusser v. Sec'y of Health & Human Servs., 28 Fed. Cl. 516, 523 (1993).  However, compelling oral testimony may be more persuasive than written records.  Campbell, 69 Fed. Cl. at 779 ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."); Camery v. Sec'y of Health & Human Servs., 42 Fed. Cl. 381, 391 (1998) (this rule "should not be applied inflexibly, because medical records may be incomplete or inaccurate"); Murphy v. Sec'y of Health & Human Servs., 23 Cl. Ct. 726, 733 (1991) ("[T]he absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance.") (citation omitted), aff'd, 968 F.2d 1226 (Fed. Cir. 1992).

## Discussion

Based on Mr. Peterson's contentions, as well as the Secretary's challenges to his claim, <u>see</u> Resp't's Resp. at 2, the key issues involve: (1) whether Mr. Peterson began experiencing right shoulder pain in 2014 before his vaccination such that any pre-existing problem explains the alleged pain experienced post-vaccination, (2) whether Mr. Peterson experienced pain within 48 hours after his flu vaccination, and (3) whether Mr. Peterson's shoulder pain continued without interruption. 42 C.F.R. §100.3(c)(10)(i)-(ii). The undersigned finds that Mr. Peterson experienced pain before his vaccination that could explain his post-vaccination pain; that Mr. Peterson experienced pain within 48 hours of his vaccination; and that Mr. Peterson experienced a temporary resolution of shoulder pain between June 2016 and February 2017.

### A. Shoulder Problem before Vaccination

The parties dispute the onset of Mr. Peterson's shoulder pain. Mr. Peterson asserts that before vaccination, he did not suffer shoulder pain and that the pain began immediately after his flu vaccination. The Secretary asserts that Mr. Peterson complained of pain in the affected shoulder more than a year prior to vaccination.

The first incident relevant to Mr. Peterson's pre-vaccination pain occurred on April 5, 2014, when he experienced a "haying accident" that occurred on the Petersons' farm. Mr. Peterson described that he "trapped [his] wrist between the hay and . . . a metal bale feeder," injuring his wrist to the point that he sought emergency medical treatment. Exhibit 20 (Deposition Tr. of Alan Peterson) at 5. In the records from Mr. Peterson's emergency department visit, Dr. Brunk noted that Mr. Peterson had "injured his right wrist . . . fielding hay bales" and that "examination of right wrist shows a bit of swelling over the proximal wrist." Exhibit 2 at 161. Dr. Brunk did not, however, note any report or evidence of a shoulder injury. <u>Id.</u> at 161-64. Both Mr. Peterson and his wife, Susan Peterson, describe Mr. Peterson experiencing shoulder pain as an extension of the wrist injury that was the predominate injury resulting from this incident. Exhibit 20 at 128-29; exhibit 21 (Deposition Tr. of Susan Peterson) at 35. Specifically, Mr. Peterson testified that "the [right shoulder] pain extended the length of [his] arm and to [his] wrist." Exhibit 20 at 162. However, Mr. Peterson noted that all injuries, including the shoulder pain, resolved within six weeks after this incident. <u>Id.</u> at 11.

According to his medical records, Mr. Peterson first complained of right shoulder pain later that year during a visit to his primary care doctor, Dr. Burnet, on August 25, 2014.  Exhibit 2 at 172.  Though Mr. Peterson claims not to recall much of the content of the visit reflected in Dr. Burnet's notes, these notes indicate that during this visit, Mr. Peterson reported right shoulder pain that began six weeks prior as a result of a strain from overhead lifting.  Id.  Specifically, in his notes, Dr. Burnet states:

> Does mention injuring his right shoulder.  Lifting something.  Pain started to the right anterior shoulder at that time.  Present for 6 weeks.  No [sic] getting better.  Over head lifting and pushing activities cause pain . . . Has had previous issues with right shoulder.  Has has [sic] therapy in the past.

Id.  Dr. Burnet conducted a physical examination of Mr. Peterson's shoulder and noted "some painful [range of motion] at right shoulder with external rotation" and "[s]ome tender to anterior shoulder."  Id. at 176.  He further characterized the injury as a "rotator cuff issue" and offered Mr. Peterson a physical therapy referral.  Id. ("For right shoulder, likely rotator cuff issue.  Offered PT.  He has home program that he received with his last shoulder injury.").

The parties differ in their interpretations of Dr. Burnet's note describing the shoulder injury.  Mr. Peterson argues that his complaint to Dr. Burnet about shoulder pain related to the April 5, 2014 haying accident Mr. Peterson.  Exhibit 20 at 71-74 (claiming there was no explanation for Dr. Burnet's mention of new shoulder pain not resulting from the haying accident).  On the other hand, the Secretary maintains that this shoulder pain developed from a later strain from overhead lifting during a "cattle feeding incident."  See Pet'r's Mot. For Fact Ruling at 7 ("Petitioner presented to his primary care physician, Dr. Joel Burnet, following a cattle feeding incident . . ."); Resp't's Resp. at 1 n.1 (contending that Mr. Peterson complained of "distinct and separate shoulder pain" at the August 2014 visit).

Weighing Mr. Peterson's medical records against his and Ms. Peterson's testimony, a preponderance of the evidence supports a finding that Mr. Peterson experienced right shoulder pain distinct from his haying accident in 2014.  The notes made by Mr. Peterson's primary care doctor, Dr. Burnet, are of particular weight and persuasiveness.  In these notes made during the appointment on August 25, 2014, Dr. Burnet specifically states that Mr. Peterson reported injuring his right

shoulder "lifting something" about six weeks prior to the appointment, resulting in pain on the "right anterior shoulder." Exhibit 2 at 172.

As the Secretary notes in his response, there is no record of Mr. Peterson complaining of shoulder pain immediately after the haying accident, <u>see</u> exhibit 2 at 161-64, and Dr. Burnet specifically notes at the August 2014 visit that the shoulder pain complained of occurred as a result of strain from overhead lifting, and that the pain had only been present for six weeks prior to this appointment. Exhibit 2 at 172. Additionally, notes from a physical therapy session on May 27, 2016, refers to this same pre-vaccination shoulder pain when describing Mr. Peterson's medical history. Exhibit 3 at 4. Specifically, the physical therapist states that Mr. Peterson's right shoulder pain "*worsened* in October" of the previous year after receiving his flu shot. <u>Id.</u> (emphasis added). The note goes on to describe a history of "posterior shoulder pain" that was less intense than the pain complained of during that physical therapy session. <u>Id.</u>

As discussed previously, special masters generally consider contemporaneous medical records more compelling than oral testimony, <u>Cucuras</u>, 993 F.2d at 1528, but medical records can be rebutted, <u>Blutstein</u>, 1998 WL 408611, at *5. Mr. Peterson has offered no explanation in this case to discredit the information contained in these documents. When asked about Dr. Burnet's notes, Mr. Peterson stated that Dr. Burnet's mention of the pain being "present for 6 weeks" referred to his shoulder pain following the April 2014 haying incident lasting for six weeks. Exhibit 20 at 71. He could not explain, however, why the note "No getting better" immediately followed "present for 6 weeks" in Dr. Burnet's notes, stating "I don't know where that came from. I really don't." <u>Id.</u> In his deposition, Mr. Peterson speculated that Dr. Burnet and he may have been discussing the haying incident at the time, but could not recall sustaining any other injury that year. <u>Id.</u> at 72. Mr. Peterson also could not recall specifics related to Dr. Burnet's shoulder examination, diagnosing a "rotator cuff issue," or offering physical therapy during this same appointment, though these steps are all documented in Dr. Burnet's notes from the appointment. <u>Id.</u> at 72-73; exhibit 2 at 176 ("For right shoulder, likely rotator cuff issue. Offered PT. He has home program that he received with his last shoulder injury."). Additionally, Mr. Peterson has offered no explanation for or evidence rebutting the notation made by his physical therapist on May 27, 2016, referring to pre-vaccination right shoulder pain. Exhibit 3 at 4. When asked about this note, specifically the portion indicating a history of shoulder pain before his October vaccination, Mr. Peterson stated that he did not recall reporting any pre-vaccination shoulder pain to the physical therapist other than in connection with the haying incident, and denied

experiencing ongoing shoulder pain at the time of vaccination as implied in the physical therapist's notes.  Exhibit 20 at 91.

Thus, though the witnesses' testimony indicates Mr. Peterson did not complain to his family and friends about right shoulder pain before his flu vaccination, see exhibit 21 at 19; exhibit 22 at 20; exhibit 25 at 35, the undersigned finds that the absence of specific complaints during this time period does not outweigh the medical documentation of pre-vaccination rotator cuff issues and right shoulder pain.

Mr. Peterson stated that any shoulder pain he experienced in 2014 resolved by "the last quarter of 2014."  Exhibit 6 at 1, ¶ 2.  Between his August 2014 visit to Dr. Burnet and his flu vaccination in October 2015, Mr. Peterson continued to engage normally in his hunting and fishing activities, travelling to Marinette, Wisconsin, for one overnight trip, and Mobridge, South Dakota, for two overnight trips.  Exhibit 9 at 3, ¶ 18.  However, the Secretary contends that Mr. Peterson's right shoulder pain was ongoing up until he received his flu vaccination in October 2015.  See Resp't's Resp. at 14-15; see also exhibit 3 at 4 (stating that Mr. Peterson's pain "worsened" in October 2015 after receiving the flu shot).  The evidence indicates the shoulder pain, while potentially not continuous at the same level of intensity throughout this time period, remained and fluctuated during the time between the overhead lifting strain six weeks prior to Mr. Peterson's August 2014 visit with Dr. Burnet and his flu vaccination in October 2015.  This is evidenced most notably by the physical therapist's notation describing the pain as having "worsened" at the time of Mr. Peterson's flu shot.  Exhibit 3 at 4.

## B. Vaccination and Shoulder Problems within 48 Hours

On October 27, 2015, Mr. Peterson and his wife received their flu vaccinations.  Exhibit 2 at 232; exhibit 21 at 36.  Mr. Peterson reports that he started experiencing shoulder pain immediately after receiving the flu shot, and that the pain steadily increased over the following few days.  Exhibit 20 at 138-40.  Mr. Peterson then states that he complained to his friend Daryl Steinke about the shoulder pain a few days later while the two were en route to Mobridge, South Dakota, for a fishing trip.  Id. at 23.  Mr. Steinke testified in his deposition both that Mr. Peterson complained about shoulder soreness on that drive and had to drive with his left arm more than usual because of his right shoulder pain.  Exhibit 22 at 17-18, 20.  There is some dispute as to when this trip took place.  However, while the exact date of departure is unclear, the testimony of both Mr. Peterson and Mr. Steinke, as well as a receipt from a gas station in Mobridge dated October 29,

2015, tend to establish that the fishing trip began on October 29 and lasted through the weekend after Mr. Peterson received his flu shot.  <u>See</u> Exhibit 20 at 23; exhibit 22 at 34; exhibit 18.

Mr. Peterson then claims that he remarked about his shoulder pain and exhibited his limited range of motion to his neighbor Javier Alvarez "[s]ometime probably before Thanksgiving in November," as well as during Thanksgiving dinner at the Petersons' home.  Exhibit 20 at 25-26; <u>see</u> exhibit 25 at 24-27.

Mr. Peterson visited Dr. Klein for a doctor's appointment to address his shoulder pain on April 5, 2016.  Exhibit 2 at 254.  Between his vaccination on October 27, 2015, and his appointment with Dr. Klein on April 5, 2016, Mr. Peterson saw four doctors, including an orthopedist, an otolaryngology specialist, a neuroscience clinician, and an ophthalmologist.  <u>Id.</u> at 233, 237, 239-40, 242.  He did not report shoulder pain to any of these doctors.  He explains that he delayed seeking medical treatment for his shoulder pain because Ms. Peterson had sought medical treatment from Dr. Klein and Mr. Peterson was "just waiting for her to kind of work through her process and see what Dr. Klein was going to conclude." Exhibit 20 at 37.  After realizing that Ms. Peterson's diagnosis was more serious than expected, Mr. Peterson made an appointment with Dr. Klein in February 2016 for April 5, 2016.  <u>Id.</u> at 36-37.  At this appointment, Mr. Peterson complained of right shoulder pain and stated that he had received the flu shot in November 2015 and then experienced "steadily increasing pain" afterward.  Exhibit 2 at 249.  Dr. Klein then diagnosed Mr. Peterson with rotator cuff tendinitis, and prescribed regular physical therapy and periodic subacromial injections.  <u>Id.</u> at 249, 253. Following this visit, Mr. Peterson engaged in regular physical therapy appointments.  On May 27, 2016, he had a physical therapy appointment, during which the physical therapist noted: "The patient presents to Physical Therapy complaining of right shoulder pain.  He feels this was worsened in October of last year, when he had a flu shot.  Prior to this, he did have some posterior shoulder pain; however, was not as bad as it currently is."  Exhibit 3 at 4.  Mr. Peterson completed his final physical therapy appointment on June 21, 2016, attaining what the physical therapist characterized as "limited progress."  <u>Id.</u> at 7.  Finally, Mr. Peterson visited Dr. Klein for a check-up on his right shoulder pain almost a year later on March 21, 2017.  Exhibit 2 at 372.  During this appointment, Dr. Klein noted that Mr. Peterson "did well with Therapy and really has had no pain . . . For some reason over the past 4-6 weeks he has noticed an increase to the point where it is difficult for him to do overhead activities, lift/push/pull, and causes him to awake at night."  <u>Id.</u>

9

A preponderance of the evidence supports a finding that Mr. Peterson did experience right shoulder pain within 48 hours of receiving the flu vaccine.  He has provided consistent evidence in the form of both medical documentation and witness testimony, that he began experiencing pain almost immediately after vaccination.  Furthermore, the undersigned finds that the proffered explanation for delay in seeking treatment appears reasonable under the circumstances.  The Secretary's chief contentions in support of his position that Mr. Peterson did not experience shoulder pain within 48 hours are: (1) that he did not seek treatment until February 2016 (and did not see a doctor until April 2016), and (2) that he failed to mention his shoulder pain to any of the four doctors he saw between his vaccination in October 2015 and his appointment with Dr. Klein in April 2016.  When asked about his reason for delaying treatment, Mr. Peterson referenced his wife's own shoulder pain resulting from her vaccination, and stated that he was waiting to see how her appointment with Dr. Klein and diagnosis panned out before deciding whether to pursue his own treatment.  Exhibit 20 at 37.  Ms. Peterson corroborated this testimony.  Exhibit 21 at 40 ("We figured we had the same thing, whatever it was, and he wanted to see what they said about mine.").  Though a significant delay in seeking treatment may be persuasive in finding that a SIRVA injury did not occur within the required time frame, reasonable explanations proffered by the petitioner such as administrative delay in getting an appointment and reasonable periods of time before making an appointment can rebut this argument.  See, e.g., Almanzar v. Sec'y of Health & Human Servs., No. 16-0340V, 2017 WL 8220616, at *3 (Fed. Cl. Spec. Mstr. Dec. 21, 2017) (finding a four-month delay in getting treatment reasonable where the petitioner attempted to make an earlier appointment but was unable to get an appointment until four months post-vaccination).  In this case, based on Mr. Peterson's reasoning with respect to his wife's medical treatment and administrative delay in setting up an appointment after attempting to do so in February 2016, the undersigned finds Mr. Peterson's delay in obtaining treatment reasonable under the circumstances.

Furthermore, Mr. Peterson testified that he did not report his shoulder pain to the four doctors he saw between his vaccination date and his April 2016 appointment with Dr. Klein essentially because he did not feel that information about his shoulder pain was relevant to the subject of any of the appointments.  As a preliminary matter, the undersigned finds it reasonable that Mr. Peterson did not mention his shoulder pain to the otolaryngology specialist in December 2015 or the ophthalmologist in March 2016, given that these visits concerned problems related to his ears and eyes—issues entirely separate from a shoulder injury.  It is slightly more significant that Mr. Peterson did not mention his shoulder pain to his orthopedist or during the follow-up visit for his stroke.  However, the undersigned

accepts as reasonable Mr. Peterson's explanations that he was only at the orthopedist "for a knee injection and a consult on [his] . . . potential knee replacement" and "was never in the habit of talking about other . . . areas," and did not mention the shoulder injury at the stroke follow-up visit because he and the doctor "may have talked about [his] knee before" and that he "just wouldn't bring [the shoulder injury] up."  Exhibit 20 at 35-36.

In addition to these factors, Mr. Peterson produced testimony that was then corroborated by three other witnesses' testimony, as well as reports by Mr. Peterson recorded in contemporaneous medical records.  Mr. Peterson testified that he spoke with both Mr. Steinke and Mr. Alvarez about his pain "since his flu shot," and this was corroborated by both of their testimonies.  Exhibit 22 at 17-18, 20; exhibit 25 at 24-27.  Ms. Peterson also testified to witnessing Mr. Peterson experience pain immediately following the receipt of his flu shot, and a daily increase in pain for days thereafter.  Exhibit 21 at 36-38.  This testimonial evidence, coupled with Mr. Peterson's reports of shoulder pain "since his flu shot" to Dr. Klein and his physical therapist make it more likely than not that he began experiencing right shoulder pain within 48 hours of receiving the flu shot.

The weight of the evidence supports that Mr. Peterson started experiencing right shoulder pain within 48 hours after his flu vaccination.  However, as previously discussed, it is more likely than not that, based on Mr. Peterson's medical records (particularly notations made by Dr. Burnet in August 2014 and his physical therapist in May 2016), he experienced a history of right shoulder pain beginning in 2014.  Thus, the evidence indicates an onset date of July 14, 2014, or approximately six weeks prior to his appointment with Dr. Burnet on August 25, 2014.

## C. Temporary Resolution of Shoulder Pain

In response to the Secretary's third requested finding that "petitioner's shoulder pain resolved from early July 2016 and did not return until approximately mid-February 2017," Resp't's Resp. at 2, the undersigned finds that, based on Mr. Peterson's medical records (namely the notation made by Dr. Klein during the appointment on March 21, 2017), it is more likely than not that Mr. Peterson's right shoulder pain abated between approximately June 21, 2016, and 4-6 weeks prior to the March 21, 2017 appointment (February 7-21, 2017).  See exhibit 2 at 372 (noting that Mr. Peterson responded very well after attending physical therapy in May and June 2016, and "really has had no pain" until 4-6 weeks before the instant visit).  Mr. Peterson does contest the assertion that his shoulder pain

temporarily resolved, stating that in response to Dr. Klein's questions about his pain during the March 21, 2017 appointment, he "told [Dr. Klein] that the pain ha[d] increased . . . but the pain in the shoulder had always been there." Exhibit 20 at 47.  He further testified that he believed Dr. Klein to have been "disinterested" and "dismissive" during this appointment because he suspected Dr. Klein "knew that there was some pending litigation."  Id. at 47-48.

However, the weight of the evidence supports a finding that there was some abatement in Mr. Peterson's shoulder pain between approximately mid-June 2016 and mid-February 2017.  The undersigned notes that this could be the function of a shoulder injury that tended to ebb and flow, as opposed to remaining at a constant level of intensity; however, it does appear from the evidence that the particular time period in question was a period of lesser pain.

## Conclusion

For the reasons explained above, the undersigned finds that:

(1)  In the April 5, 2014 haying accident, Mr. Peterson predominately injured his wrist.  Mr. Peterson experienced some shoulder pain derived from his wrist injury.  This injury healed by the end of May 2014;
(2)  Mr. Peterson first experienced right shoulder pain on approximately July 14, 2014 in connection with overhead lifting;
(3)  this shoulder pain was similar to the shoulder pain Mr. Peterson later experienced;
(4)  Mr. Peterson received a flu vaccination on October 27, 2015;
(5)  Mr. Peterson's shoulder pain worsened within 48 hours of receiving the flu vaccination; and
(6)  Mr. Peterson's worsened shoulder pain persisted until approximately mid-June 2016, when it temporarily abated until mid-February 2017.

The parties are ordered to provide this ruling to any expert they retain.  If the expert's opinion is not consistent with these findings of fact, the opinion is likely to not be persuasive.  See Burns v. Sec'y of Health & Human Servs., 3 F.3d 415, 417 (1993) (holding that the special master did not abuse his discretion in refraining from conducting a hearing when the petitioner's expert "based his opinion on facts not substantiated by the record.").

A status conference is set for **Friday, November 22, 2019, at 11:00 A.M. Eastern Time**.  Mr. Peterson should be prepared to propose the next step in this case.

     **IT IS SO ORDERED.**

<u>s/Christian J. Moran</u>
Christian J. Moran
Special Master